**UNITED STATES FILTER CORPORA-TION, U.S. Filter/Ionpure, Inc., IP Holding Company, Millipore Corporation and Millipore Investment Holdings Limited, Plaintiffs**

v.

**IONICS, INCORPORATED, Defendant**

Civil Action No. 98–10541–REK.

United States District Court,
D. Massachusetts.

Jan. 9, 2001.

Jerome P. Facher, William F. Lee, Wayne M. Kennard, Mark Daniel Selwyn, Hale & Dorr, Boston, MA, Elizabeth Olivier, United States Filter Corporation, Assistant General Counsel, Palm Desert, CA, for United States Filter Corp.

Jerome P. Facher, William F. Lee, Wayne M. Kennard, Christine A. Maglione, Dimitry S. Herman, Beth E. Turetsky, Mark Daniel Selwyn, Wayne L. Stoner, Peter M. Dichiara, Hale & Dorr, Boston, MA, for IP Holding Company.

James S. Dittmar, Hutchins, Wheeler & Dittmar, Boston, MA, Stephen Korn, Watertown, Anthony J. Fitzpatrick, Michael R. Gottfried, Duane, Morris & Heckscher LLP, Dennis D. Allegretti, Duane, Morris & Heckscher LLP, Boston, Stanley L. Amberg, Orrick, Herrington & Sutcliffe, LLP, New York, NY, for Ionics, Incorporated.

Timothy J. Dacey, III, Richard W. Renehan, Hill & Barlow, Boston, MA, for Toby H. Kusmer.

Susan G.L. Glovsky, Jon C. Trachtenberg, Hamilton, Brooks, Smith & Teynolds, P.C., Lexington, MA, Gary H. Levin, Todd S. Holbrook, Eric H. Vance, Lynn B. Morreale, Woodcock, Washburn, Kurtz, Mackiewicz & Norris, Philadelphia, PA, for Millipore Corp., Millipore Investment Holdings Limited.

## Opinion

KEETON, District Judge.

### I. Introduction

#### A. The Limited Scope of This Opinion

This opinion addresses the requests of plaintiffs ("USF") for an order of preclusion against defendant Ionics because of allegedly ongoing and egregious misconduct of Ionics, its most senior executives, and its attorneys, in relation to disclosure obligations, false representations, false testimony in depositions, and ongoing failure to correct false representations in docu-

ments, letters, and testimony, and acts and omissions of discovery abuse.

I conclude that severe sanctions are appropriate and make orders accordingly for the reasons explained in this opinion.

## B. The Structure of This Opinion

The sequence of main topics in this opinion and to a large extent the organization within each topic are substantially patterned after the oral argument of counsel for USF at the hearing of December 20, 2000. That sequence also appears in the looseleaf notebook prepared in advance and made available to me and to opposing counsel for use during the hearing.

This sequence was designed by counsel for USF to build, step by step, a compellingly persuasive account of increasingly severe misconduct by Ionics, commencing at an early stage in the history of this case and growing more and more egregious over a period of almost two years.

This opinion departs from that sequence at the outset, in Part I.A. above, to state my conclusion that a severe sanction against Ionics is required in the interests of justice. The opinion departs also, from time to time, to take note of earlier and later events in the sequence that reenforce findings and conclusions that the developing structure of the argument have by that point persuasively established. In most other respects, however, the account of events stated in this opinion differs from that of counsel for USF only in that it omits some of the corroborative details that the argument of counsel for USF brought to my attention.

## C. The Core Subject Matter to Which Alleged Discovery Abuse by Ionics Relates

My construction of the patent claim at issue in this litigation, recited and explained in my Opinion and Order of October 8, 1999 (Docket No. 227), handed down after an extended evidentiary hearing, emphasized the patent-claim phrase, "sub- stantially uniform size." The discovery abuse in this case has all related in some way (a) to *Ionics' nondisclosure* of facts and documents that should have been disclosed by Ionics and its representatives, including its succession of attorneys as it changed law firms six times in approximately two years, (b) to *representations* that have turned out to be false, and (c) to *failures to acknowledge* in a timely and fully forthcoming manner that the representations were false and in precisely what way or ways. Persistently Ionics has withheld matter that it knew to be evidence contradicting Ionics' position on "substantially uniform size." That position is at the very heart of this litigation. No subject matter more important to this case has been identified. Thus, this is discovery abuse in a context most critical to prompt and fair adjudication of the core controversy that drives this litigation.

## D. Relevant Background Events and Procedural Events

This is a calendar of background events and procedural events that are relevant to USF's allegations of discovery abuse by Ionics and responses asserted by Ionics.

01/20/1998 Ionics created document on Resin EDI MIXED MONOSPHERE (See 02/03/1999 calendar entry re: production).

03/10/1998 Ionics started to make, sell, lease, or license EDI stacks using ion exchange resin beads "that plaintiffs might arguably content [sic] to be of 'substantially uniform size.'" Hearing Exhibits, December 20, 2000, Tab 5; Docket No. 149, at 29.

03/27/1998 This civil action was filed by USF against Ionics.

XX/XX/1998 (The exact date does not appear in the record now before the court.) USF's First Request for Production of Documents was served on Ionics. It calls attention to the point that under Fed.R.Civ.P. 26(e) "these requests are continuing so as to require supplementation." Request 16

called for "All documents concerning the design, manufacture, use, dimensions, and/or performance of resins in any EDI or CEDI stack made, sold, imported, offered for sale, used, leased, or licensed by or for Ionics, including without limitation all documents concerning the use and condition of resins in the depleting or concentrating compartment." Hearing Exhibits, December 20, 2000, Tab 1.

XX/XX/1998 (The exact date does not appear in the record now before the court.) Ionics Response to USF's First Request was served. Response to Request 16 was as follows: "Ionics has produced documents describing the type and dimensions of resins used in EDI systems made, sold, offered for sale, used, leased, or licensed by or for Ionics from March 10, 1998 to the present, and will produce further non-privileged and non-exempt documents, if any, describing the type and dimensions of such resins. To the extent the request seeks other documents, Ionics objects on the grounds that the request is overbroad, unduly burdensome and oppressive; seeks irrelevant and inadmissible material; and is not reasonably calculated to lead to the discovery of admissible evidence." Hearing Exhibits, December 20, 2000, Tab 2 at 9–10.

06/04/1998 An Ionics representative, R. Parent, sent an email message to four addresses "@Ionics," with "cc" to three other persons "@Ionics," one of whom was *"wcarson@Ionics." See* Chalk 3 used at the hearing of December 20, 2000, by defense counsel. This email message was on the subject, "EDI resin mix."

It is beyond dispute that "wcarson" refers to William W. Carson, who was on 06/04/1998 and is now in the top executive ranks of Ionics. In his deposition, taken on November 22, 2000, Mr. Carson testified as follows:

Q. Okay. So to sum up you've been aware since January of 1999 that the descriptor field in the bill of materials for the resin is inaccurate?

A. Yes.

Transcript of Deposition of William W. Carson, November 22, 2000, at 94.

The period between January of 1999 and November 22, 2000 is approximately 20 months. Thus, when Mr. Carson gave this and other answers in his deposition of November 22, 2000, he had known for approximately 20 months that the descriptor field in the bill of materials for resin was inaccurate. He and all other representatives of Ionics, including their attorneys in the five law firms that had, in succession, represented him up through the time of his deposition, remained silent rather than disclosing the fact of this inaccuracy to USF, its counsel, and the court.

During all this period of silence on this critical fact, Ionics' counsel repeatedly responded to USF's successive motions to compel more directly responsive and forthcoming answers to USF's interrogatories in words exactly like, or closely similar to those appearing in Ionics, Incorporated's Opposition to Plaintiffs' Motion to Compel (Docket No. 149, filed April 13, 1999), as follows:

4. Ionics does not infringe any claim of the '741 Reissue Patent, and hence has no documents responsive to this request. Ionics has produced to plaintiffs documents describing those EDI stacks that it has made, sold, leased or licensed since March 10, 1998, using ion exchange resin beads that plaintiffs might arguably contend to be of "substantially uniform size." In particular, Ionics has produced its standard Bill [sic] of Materials and its design drawings [sic] for those stacks. The Bill [sic] of Materials and design drawings [sic] provide all the information plaintiffs need to determine for themselves "whether Ionics infringes the '741 Reissue Patent."

Docket No. 149 at 47. (*See* calendar entry for 04/13/1999, below).

Note, *first,* that "Bill" is consistently singular and "drawings" is consistently plural. This contrast leads naturally to the inference that only one "Bill of Materials" is involved, but two or more "drawings." The possibility that this arrangement of singular and plural words was accidental and not intentionally chosen to mislead is undercut by the consistent repetition, not only in this one document but in others as well. *See, e.g.,* Ionics, Incorporated's Opposition to Plaintiffs' Motion to Compel, Docket No. 126, filed February 16, 1999, at 3–4; Docket No. 149 at 29, 47; *see* Transcript of Hearing, December 20, 2000, at 6–9.

Note, *second,* that instead of responding directly and forthrightly to a properly framed USF interrogatory, as rules and practices in this court require, Ionics invokes an implicit assumption that it is entitled to transfer the burden to USF to figure out an answer about what Ionics was doing. This is a tactic that, if unchallenged by USF or allowed by a trial judge who had been misled by Ionics' representations and arguments at hearings on the motions to compel, would enable Ionics to get away with both burden shifting and delay that imposed heavy discovery costs, including attorney fees, on USF.

Note, *third,* that over a period of months Ionics (a) persisted in this course of nondisclosure, and (b) attempted and was to some extent temporarily successful in its deception of USF's counsel and the trial judge. *See* Transcript of Hearing, December 20, 2000, at 8 ("they said seventeen times that the bills of materials were the beginning and the end of the inquiry."). Only when the threat of exposure and sanctions became imminent did Ionics begin to make partial but misleadingly incomplete acknowledgments of its false statements.

Note, *fourth,* that in July, 1999, Keith Sims, who headed EDI research and development for Ionics and was produced as a 30(b)(6) witness, answered evasively: "The bases for these contentions may be derived or ascertained from documents produced by Ionics, and in particular from documents bearing the identifying numbers [of the bills of materials and no other documents]." *See* Deposition Transcript, _____, 1999, p. _____. *See also* Transcript of Hearing, December 20, 2000, at 9–10.

Note, *fifth,* [ROWE] was not produced for deposition either when Li Zhang was produced or when Keith Sims was produced. *See* Transcript of Hearing of December 20, 2000, at 10–11. Also, he was not named as a person to whom Li Zhang and Keith Sims went for information to prepare for their depositions. *See id.* at 11.

Note, *sixth,* that in October, 2000, Ionics filed its Expert Report. *See* Hearing Exhibits, December 20, 2000, Tab 11. The Ionics expert turned out to be a shareholder of Ionics. He used the volume ratios of bills of materials without mentioning that he had been informed by Ionics attorneys and executives that the bills of materials were allegedly wrong on the very point he drew from them in stating grounds of his expert opinion. *See* Transcript of December 20, 2000 Hearing, at 15. *See also* calendar entry for 10/XX/2000, below.

08/05/1998 Date referred to in Ionics Expert McRae's Report (date in 2000) as follows: "In the electrodeionization stacks made by Ionics after about August 5, 1998, the resin in the stacks was a mixture of: Dow Monosphere MR–3, Dow Monosphere 650C, Dow Monosphere 500C ES NG, and Dow Monosphere 550A, as stated in Exhibit C to this report." Hearing Exhibits, December 20, 2000, Tab 11 at 6.

02/03/1999 Letter from Ionics Attorney Anthony J. Fitzpatrick enclosing documents identified as I 02324 through I 02480, and stating: "Included in this production are documents numbered I 02450 through I 02480, which describe EDI stacks allegedly at issue in this case. These documents comprise Ion-

ics' standard Bill of Materials and design drawings for these EDI stacks. Since March 10, 1998, Ionics has manufactured thirty-nine of these EDI stacks. The Bill of Materials and design drawings are standard for all thirty-nine of these stacks." Document I 02424 contains an entry, designated as Item 0016 8016154, SC I/V Part Number P 8016154, date 20–Jan–98, as follows: "RESIN EDI MIXED MONOSPHERE DOWEX MONOSPHERE MR–3 UPW MIXED BED RESIN PURCHASED BY THE CUBIC FOOT CATION IN THE H + FORM ANION IN THE OH–FORM." Hearing Exhibits, December 20, 2000, Tabs 3–4.

04/13/1999 Ionics Opposition to Plaintiff's Motion to Compel (Docket No. 149) served and filed. *See* Hearing Exhibits, December 20, 2000, Tab 5. Item 4, page 29, in response to Request 16, says: "In particular, Ionics has produced its standard Bill of Materials and its design drawings for those stacks. The Bill of Materials describes the type of resins used in those EDI systems, namely resins manufactured by a third party, The Dow Chemical Company ('Dow'). If plaintiffs require further information concerning the beads, they can obtain it from Dow." Hearing Exhibits, December 20, 2000, Tab 5, at 29. Item 4, page 47, in response to Request 17, says: "In particular, Ionics has produced its standard Bill of Materials and its design drawings for those stacks. The Bill of Materials and design drawings provide all the information plaintiffs need to determine for themselves 'whether Ionics infringes the '741 Reissue Patent.'" Hearing Exhibits, December 20, 2000, Tab 5, at 47.

05/28/1999 More bills of materials were produced by Ionics. Five of these showed a new resin mixture. *See* Transcript of Hearing of December 20, 2000, at 10.

XX/XX/2000 (The exact date does not appear in the record now before the court.) USF produced Initial Expert Report of Thomas A. Davis, Ph.D., stating his understanding from Ionics' production of documents and filings by its attorneys, as follows: "I understand that sometime in 1998, after the commencement of this litigation, Ionics changed the resin used from the Dowex Monosphere MR–3 UPW (*see*, *e.g.*, 102424) to a mixture of the Dowex Monosphere MR–3 UPW, Dowex Monosphere 550A UPW (OH), Dowex Monosphere 500C NG (H), Dowex Monosphere 650C UPW (H) (*see e.g.*, I 11587–88)." Hearing Exhibits, December 20, 2000, Tab 10, at 11–12.

01/19/2000 Deposition of Li Zhang. He answers in ways inconsistent with the current positions of Ionics. *See* Hearing Exhibits, December 20, 2000, Tab 8; Transcript at 78, 80, 83–84.

07/21/2000 Continued deposition of Keith Sims. He answered in ways inconsistent with the current position of Ionics. *See* Transcript at 12, 18–19, 35, 37, 75, 79, 83, 84, 85, 89, 92.

10/XX/2000 (The exact date does not appear in the record now before the court.) Ionics produced Expert Report of Wayne A. McRae, saying: "In the electrodeionization stacks made by Ionics in the period between March 10, 1998 and about August 5, 1998, the resin in the stacks was Dow Monosphere MR–3, which was a mixed resin in which the volume ratio of anion ion exchange resin (AX) to cation ion exchange resin (CX) was 1.6:1 ...." "In the electrodeionization stacks made by Ionics after about August 5, 1998, the resin in the stacks was a mixture of: Dow Monosphere MR–3, Dow Monosphere 650C, Dow Monosphere 500C ES NG, and Dow Monosphere 550A, as stated in Exhibit C to this report." Hearing Exhibits, December 20, 2000, Tab 11, at 5–6.

10/27/2000 Friday afternoon before the date set as the trial date. Attorney Fitzpatrick sent a letter saying bills of materials were "inaccurate" but did not explain in what way and why Ionics produced inaccurate documents with no explanation. *See* Transcript at 16.

10/30/2000 Monday. Set as date for trial to begin, with jury selection if trial was to be before a jury.

11/13/2000 Ionics' Attorney Anthony J. Fitzpatrick's letter to William F. Lee, USF Attorney, saying: "The Bills of Materials for Ionics' commercial EDI devices manufactured since issuance of the patent in suit do not accurately recite the resins used in those devices." Hearing Exhibits, December 20, 2000, Tab 12, at 1–2.

11/22/2000 Video Deposition of William W. Carson:

Q When did you first learn that at least some of Ionics' bills of materials for its EDI devices were inaccurate?

A I'd like to answer that in two difference pieces, if I may. Uhm, it's quite recently that I've learned that the quantities of resins used were inaccurate. And I don't know what that means, but in the past couple of months. The resin designations we changed to the UPW resins, I believe, on the bill of materials at the very beginning of 1999.

. . .

Q Okay. So to sum up you've been aware since January of 1999 that the descriptor field in the bill of materials for the resin is inaccurate.

A Yes.

Hearing Exhibits, December 20, 2000, Tab 13, at 91, 94.

12/20/2000 Ionics produced in court a document entitled "Labels on Bags of Resin Surplus Produced for Inspection 5/21/99." In fact, the labels were first produced for opposing counsel and the court to see on 11/22/2000.

At the hearing of December 20, 2000, USF's attorney called attention to Ionics' attempt to excuse its course of conduct in the following way (my paraphrased summary rather than direct quotation):

I will now point out something that I think will demonstrate to the Court that the excuse that Ionics offers today is just more of what we have been getting for two years. They come to your Honor and represent under oath, "We had a problem with the bills of materials. Here's what one of the problems was. If the mixture was mixture A on January 1 and you pressed the button to print the material the bill of materials on January 1, it would say mixture A for let's say project 1." If again later, on June 1, you punch the button to do all of the projects back through January, but the mixture had changed to B, they claim that the computer would make a mistake, and it would show mixture B on June 1 that, for all of the projects printed on June 1, including project No. 1. But in fact their assertion about what the computer would do is just not true. Under Tab 15 we have put together two of the bills of materials that were originally given to us. They are both dated June 22, 2000. They have different mixtures, different resins identified. So this representation to your Honor that, "Oh here one of the mistakes that was made, if you press the button on June 1 everything that's printed on that day is the same," simply is not true.

They also say they just learned about all of this in the last few weeks. But, in fact, Mr. Carson, their vice president, knew two years ago, and he knew about the volume problem now three months ago. The attorneys argue to your Honor that we somehow should have known there was a problem with the bill of materials and should have done something about it. At the same time, Ionics attorneys argue that they, with access to

Mr. Carson, did not know. That simply is not credible.

Hearing, December 22, 2000, paraphrased summary of USF's attorney's statement.

Attorney Dittmar, speaking for Ionics, proposed that the court should excuse the Ionics misconduct at least to the extent of not making a preclusion order of any kind. My paraphrased summary of his argument at the hearing of December 20, 2000, follows:

Ionics and its attorneys concede, first off, your Honor, that there are inaccuracies appear in these documents. In fact, four different types of inaccuracies appear in these documents.

One type affects the retrieval of bills of materials from Ionics' electronic database. If you query the database on a particular date looking for an older bill of materials, and since that older bill of materials was initially prepared a change in standard components has been made, such as resin beads, what the system produces is the current information. I understand that Ionics' electronic data processing system is ancient and subject to a number of foibles, this included.

. . . .

Well, Tab 15 is explicable because at the time the original one of these was prepared only one part number was in use because only one type of resin was used. At a later time multiple part numbers were in use because multiple resins were used. But the part number stays the same, unless a new part number was added. What gets changed is the verbal field describing the particular resin because that verbal field has changed, not as the result of Ionics' making deliberate decisions to change the resin that it used, but because Dow changed the name for the type of resin of a particular size that Ionics had been using.

. . . .

I understand, from what previous counsel for Ionics have told me, that previous counsel for Ionics gave instructions for document retrieval and relied on reports from other Ionics representatives that they delivered to the attorneys all documents retrieved. The individuals who did the retrieving relied on what they understood to be the case. The problem was that a right hand and left hand did not make contact here. On this particular issue I can speak personally. On November 20 of this year, I discovered this as the result of going and digging because some inconsistencies that had emerged over the previous several days were really troubling me. I was out there, at the plant, and I saw a whole raft of people one right after another. I finally got to the bottom of it. And I learned that when you query the database, you get current information. You do not get historic information. That was the first time anyone, including, to my understanding because I interviewed them, anyone in senior management having anything to do with dealing with counsel in the presentation that counsel made, had any understanding of the problem.

I do not say with any great pride that this reflects the best and finest of investigative lawyering, but I do say and I mean this genuinely, that if a mistake was made, it was an innocent one. As we unearthed in a period of a couple weeks the whole set of problems as quickly as we could, we communicated through a variety of vehicles, including Mr. Fitzpatrick's letter that Mr. Lee pointed out to you.

From our standpoint this is troubling, but does not warrant an order that says that the key facts of conduct, which will be judged as infringing or not, should be decided on other than a full play of evidence of what the truth was. I am in no way asking that you foreclose any use of documents in cross-examination and the like, but I would ask for your indulgence to hear me walk you through

these several steps because it is not a simple point, point, point set of circumstances.

I hand up a chalk that is a comparison of actual resin usage, as Ionics maintains, with the resin usage that U.S. Filter claims we should be held to under the bill of particulars, and essentially the top half of the page is what Ionics says took place. The bottom half is what U.S. Filter maintains appears from the bill of materials. And what you see on both of them is that at the time of commencement of suit, which was within less than three weeks of the issuance of the patent, Ionics was using a single Dow resin. It was a mixture of anion and cation, but it had a single cation, and cation resin bead size is the issue of infringement in the case.

What you see right off the bat is that the Ionics usage was of a Dowex monosphere and U.S. Filter says it was Dow. No difference exists between Dow and Dowex except in trade name, monosphere MR–3 UPW. UPW is Dow nomenclature. It is an acronym for ultrapure water. Monosphere MR–3 UPW was not sold at the time the lawsuit was commenced. But it shows up on the bill of materials because if you query today the bill of materials of a system, that is what shows on the computer output. If MR–3 has been changed to MR–3 UPW it shows up as MR–3 UPW. You will see that starting in the summer or sometime in mid 1998 everyone agrees there was a change. That was a deliberate change. Evidence will be offered, if need be, that the change was to a mixture of three different cation resins for the purpose of putting the size distribution of the cation resins a safe distance away from the patent's limitation. And everybody seems to agree that this change was introduced.

What you see up at the top of the chalk from then on is no change in the size of the particular resins from Dow that Ionics is using. Instead, from time to time the change was the addition of the nomenclature UPW. That came about not from a deliberate decision by Ionics but from Dow's changing the marketing of its product and giving its product the "UPW" nomenclature when distributed through its ultrapure water division for marketing purposes. You see that actually MR–3 UPW is introduced in August of 1999 by Ionics, and then down in August of 2000 you see the introduction of 550 A. This results from the fact that Ionics will change its prescription of what goes into its bills of materials. Dow is now selling MR–3 UPW, and that designation will go with the product in existing inventory as it is used up. And what Ionics would like to prove at trial is that this is precisely what we did up to the point where we ran out of the old MR–3 and turned to Dow for MR–3 UPW. Then we continued until we ran out of 550 A, and then we got 550 A UPW.

One area in which Ionics' view and U.S. Filter's reliance on the bills of materials completely disagree is that Ionics never used the 650 C UPW because Ionics never ran out of old inventory of 650 C.

Another way in which a discrepancy exists between Mr. Lee's argument and Ionics' position is that the bills of materials express volumes in cubic feet. Cubic feet is the volume unit Dow uses to sell their resins. They come in big, heavy cardboard drums. I think they are 6–cubic–foot drums of these tiny resins beads. Ionics, however, in its actual use of resin, in its measurement for the use of resin in filling electrodeionization stacks does its measurements in liters, and the conversion from cubic feet to liters is not a perfect, precise conversion. And, actually, Mr. Cafua, who we have asked by our motion to be allowed to testify, submitted an affidavit, very limited, very focused. He was not a witness anyone thought of over the years as having knowledge about anything in dispute until we discovered in

late November these problems with the bills of materials. Mr. Cafua is the man who oversees the filling of the stacks. And it's a very simple process. Using a big scoop, you dip into the big drum that I told you about, and you fill a plastic bottle that has black measuring lines inside, and those measuring lines are to the liter. You fill those up. You pour them into a big tub to mix them around in water to salt them in order to sling them because they are put into the stack and then they are desalted, which expands them and puts them into a tighter fit within the EDI stack. Mr. Cafua is not being proposed as a witness on reasons for changing anything. He's just the guy who would say, "I was there. I ran the crew that filled the stacks. This is how we did them. This is what we measured, and I know that from the time of Mr. Parents' e-mail to me, we filled them in the liter ratios shown in that e-mail."

We maintain, your Honor, that no deliberate deception of any sort has occurred.

One germane point is that Ionics produced bills of materials in different waves, and some of those bills of materials evidently got retrieved in hard copy from customer files. Others were pulled out of the electronic database because the hard copy files were incomplete. The result was that in a number of instances, a bill of materials, two different bills of materials for the same project were retrieved, and they showed different descriptions of the resin that went into the stack. Now, that could not be correct, and unfortunately nobody noticed it until very recently.

. . . .

I particularly want to direct your attention to the highlighted portion at the bottom of a chalk I have handed up and this is an e-mail from Mr. Cafua, and it's in October, and it's to a variety of people, and its subject: New resin. And he says "We are using new resin on all EDI stacks, but nobody changed bill of material."

Chalk 5 shows photocopies of the labels attached to the plastic bags of the kept-moist resin beads that were physically produced in May of 1999 as part of the discovery process. Now, these were produced at offices of Ionics' counsel. And what you see here, if you turn to the second of the handwritten pages, is a series of Dowex monosphere C–500 ESNG, and Dowex monosphere 650 C which were produced, and identified as such in May of 1999, as resin being used by Ionics in the allegedly infringing devices. This is consistent with Ionics' version of what historically actually happened.

Under U.S. Filter's motion we would have a trial in which this stuff that was produced would be written out of the evidentiary world. I would respectfully suggest that this would cause confusion for the jury more than it would advance in any way the fair administration of justice.

In the last five months, six months, whenever I entered my appearance in June, we have labored diligently. We have worked to make sure that information gets disclosed. Now, I am personally only one of several counsel, to be sure, but to the extent we have learned anything, we have made sure that information gets produced. Mr. Fitzpatrick's letter of November 13 was done at my instruction to make sure that Mr. Lee and his colleagues had the information they had. We have had mistakes made. We have not seen things that could have been seen with better or more diligent digging perhaps. But when we have figured out the facts and the reality, we have taken steps immediately to apprise opposing counsel.

. . . .

U.S. Filter has expert reports analyzing resin bead size measurements and size distribution premised upon particular bead groupings consistent with what

we maintain were the actual facts, and so that is a detailed spelling out of our noninfringement position, which is what percentage of the resins are within plus or minus 10 percent of mean bead size. And Mr. Fitzpatrick's letter of November 13 was one that said to Mr. Lee, "This is what we understand the Ionics bead usage to be from this period of time to this period of time precisely this resin in this volume, this resin in this volume, and this resin in this volume." And the ultimate question that both sides' experts on measurements and instrumentation and calculations of size distribution of these very small particles have labored over is how to interpret that usage.

The person who put the EDI device together does not mentally in any fashion figure out the resin size distribution. You have to put very, very different pieces together, and one is necessarily an expert piece. And we have done that. We have given that in very full and complete detail.

And I finally want to say that the resins that we maintain were used have all been made available to U.S. Filter, all of them physically.

The prejudice from this snafu over the bill of materials is not a great prejudice.

If a need exists for additional work to be done by counsel or by experts as the result of this, I think it is fair to charge Ionics for that, but the Draconian remedy of having a jury sit and hear evidence on whether or not certain use of materials violates a patent when that use of materials is not reality goes too far. A more appropriate method of dealing with this ought to be pursued.

Transcript of Hearing, December 20, 2000, at 24–48 (my paraphrase).

Mr. Lee, USF's attorney, responded at the hearing of December 20, 2000, as follows:

We do not bring this preclusion motion lightly but I think I can demonstrate to your Honor in about five minutes that the conduct of which we complained is continuing right up until this hour. If I could ask your Honor to turn in our notebook to Tab 13, and if we just got to the first page, your Honor, you'll see that Tab 13 is a deposition of William Carson, and I'd like the Court to know who Mr. Carson is. He is a vice president of research and development at Ionics. He is one of the central people in management. He testified that he reviewed all of the opinions of counsel in this case. He testified that he participated in the decision to make the change from mixture 1 to mixture 2. The president of the company, Mr. Goldstein, testified that Mr. Carson was the person who made the decision. Mr. Carson also did some tests. You may remember Mr. Carson, your Honor, because we had moved to preclude him from testifying at the first trial. Your Honor had entered a draft order which addressed that. There was argument, and Ionics offered that this was an important person with factual information who is at the center of some of the events. And in fact your Honor if you look at Chalk 3, which Ionics now, I guess, is saying is really what is going on at Ionics, you'll see that Mr. Carson back in 1998 was one of the carbon copy recipients of this now very important document, a document that was in front of Mr. Sims when he was asked whether the bills of materials were accurate.

If I could turn, your Honor, to Page 94 in Tab 13, now, I'd like your Honor to have in mind Mr. Dittmar's representation and I think I have it down accurately: "Until this November, there was absolutely no recognition in upper management or among counsel that there was a problem with the bills of materials."

Here is what upper management said a month ago in a deposition that resulted from the fact that we reached an

agreement after argument before your Honor that he could testify. "So to sum up you have been aware since January of 1999 that the descriptor field in the bill of materials for the resin is inaccurate? Answer: Yes."

Now, your Honor, he knew this before they produced the bills of materials. They produced the bills of materials on February the 3rd, 1999. Mr. Carson knew that at that time they represented to the Court that the bills of materials were the beginning and the end. The corporation is a party. It is legally accountable for the state of mind of a person at senior management level. The corporation is accountable for what this gentleman knew in January of 1999. And we know from the discovery that we received on the opinion of counsel that he was working with Mr. Fitzpatrick in 1998 on the opinion. So the argument that "we're sorry, we made a mistake" and that it was "the result of ineptitude" does not square with the details of Ionics' factual disclosures. Either "there was gross negligence or reckless conduct" in not going to the person who made the change and asking him "and then making representations," or else it was intentional discovery abuse. At a minimum, we have been through two years of discovery. By their own public disclosures to their shareholders, millions of dollars have been spent in discovery. And then, on November 13, 2000, two weeks after your Honor's first trial date, we learn something that this gentleman knew 20 months before. This is a situation in which Ionics from the first go in discovery till today is not shooting square. And if their argument to avoid sanctions rests upon the fact that only by hard work of counsel in November did they learn of this lengthy explanation, some of which is new to us today, the answer is the sworn testimony of their own executive vice president who says the contrary. And that's why we think, your

Honor, that the preclusion order is necessary.

Transcript of Hearing, December 20, 2000, at 48–51 (my paraphrase of the argument by counsel for USF).

### E. The Evidentiary Basis for Findings, Conclusions, and Rulings in This Opinion

The relevant evidence before me at this time is in the form of deposition testimony, documents, and letters brought to my attention in the hearing on this controversy over alleged discovery abuse. By a preponderance of this evidence I find that it is overwhelmingly likely that Ionics, through its executives, attorneys, and other representatives for whose knowledge Ionics is legally accountable, knows of other documents, letters, emails, and other forms of evidence that, if disclosed to USF, or its counsel, or me, would provide to USF additional evidence to challenge the accuracy of both what counsel for Ionics represented in the past to be Ionics' position about actual use of resin by Ionics and what Ionics represents now. In the order made along with the filing of this opinion, I require that Ionics forthwith disclose the identity of each of its representatives who knows that one or more such documents, letters, emails, or other forms of evidence not yet disclosed do exist now, or did exist at a time past and either can be found by a thorough search or else must have been destroyed or lost. Also, the order requires that a report be served on opposing counsel and filed with the Clerk on or before January 24, 2001, disclosing all such evidence it has been able to gather up to the time of that service and filing, and state what additional steps it is taking to produce any other such documents, letters, emails or other forms of evidence.

### II. Filings Related to Matters Addressed in This Opinion

Related in some way to matters addressed in this Opinion are the following filings:

(1) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Offering Or In Any Way Relying Upon Measurements Performed On Resin Mixtures Different From What Is Shown In the Bills of Materials (Docket No. 289, filed November 22, 2000) (to preclude Ionics' reliance on measurements on mixtures different from those shown on bills of materials ("BOMs")).

(2) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Referring To Any Alleged Use By Its Expert of "Ionospheres" Or "Uniform Beads" In An Electrodeionization Device Before the Invention Of the Patent–In–Suit (Docket No. 290, filed November 22, 2000) (to preclude Ionics' references to alleged use by its expert of monospheres).

(3) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Arguing Or In Any Way Suggesting To the Jury That Ionics Has Used Resin Different From What Is Shown In Its Bills Of Materials (Docket No. 291, filed November 22, 2000) (to preclude Ionics' saying to jury that Ionics has used resin different from what is shown in BOMs).

(4) Ionics, Incorporated's Motion In Limine To Preclude Any Reference To the Court's Memorandum and Order of October 8, 1999 (Docket No. 293, filed November 22, 2000) (to preclude USF's saying to jury anything about the court's Opinion and Order of October 8, 1999 (Docket No. 227)).

(5) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Opposition to Defendant Ionics, Incorporated's Motion In Limine to Preclude Any Reference to the Court's Memorandum and Order Dated October 8, 1999 (Docket No. 302, filed November 28, 2000).

(6) Defendant Ionics, Incorporated's Unopposed Motion To File Under Seal (Docket No. 294, filed November 22, 2000) (with sealed matters docketed as 295, 296, 297, 298). The text of the motion to file under seal states that Ionics moves to exclude testimony of USF's designated expert witness, Terry L. Musika, and moves to supplement Ionics' witness list by adding persons whose names it wishes to remain under seal.

(7) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Opposition to Defendant Ionics, Incorporated's Motion in Limine to Exclude Testimony of Terry L. Musika (Docket No. 303, filed November 28, 2000) and Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Opposition to Defendant Ionics, Incorporated's Motion to Supplement Witness List by adding ROWE (code name to be used, if I am persuaded that the true name should not appear now in documents accessible to the public) (Docket No. 304, filed November 28, 2000).

(8) Opposition of Ionics, Incorporated to U.S. Filter's Motion in Limine to Preclude Ionics from Arguing Or In Any Way Suggesting To the Jury That Ionics Has Used Resin Different From What Is Shown In Its Bills Of Materials (Docket No. 306, filed under seal November 29, 2000).

(9) Ionics, Incorporated's Opposition to U.S. Filter's Motion in Limine to Preclude References to Any Alleged Use By Its Expert of "Monospheres" Or "Uniform Beads" In An Electrodeionization Device Before The Invention Of The Patent–in–Suit (Docket No. 307, filed November 29, 2000).

(10) Opposition of Ionics, Incorporated to U.S. Filter's Motion in Limine to Preclude Ionics From Offering Or In Any Way Relying Upon Measurements Performed On Resin Mixtures Different From

What Is Shown In Its Bills Of Materials (Docket No. 311, filed November 29, 2000).

(11) Sealed Documents (Docket Nos. 331–333, filed December 12, 2000).

(12) Sealed Document (Docket No. 335, filed December 18, 2000).

(13) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., And IP Holding Company's Supplemental Memorandum In Further Support Of Their Motions In Limine Regarding Bills Of Materials (Docket Nos. 289 And 291) (Docket No. 352, filed December 21, 2000).

(14) Ionics, Incorporated's Supplemental Memorandum In Further Opposition To Plaintiffs' Motions In Limine Regarding Bills Of Materials And Ionics, Incorporated's Motion to Supplement Its Witness List (Docket No. 357, filed December 22, 2000).

### III. Terms of Preclusion Order

USF requests (Docket No. 289) an order in limine precluding Ionics from offering or in any way relying upon measurements performed on resin mixtures different from what is shown in bills of materials.

USF requests (Docket No. 290) an order in limine precluding Ionics from referring to any alleged use by its expert, before the invention of the patent in suit, of an electrodeionization device, of "Ionospheres" or "Uniform Beads."

And USF requests (Docket No. 291) an order in limine precluding Ionics from arguing or in any way suggesting to the jury that Ionics has used resin different from what is shown in its bills of materials.

I conclude that these requests should be allowed to the extent that Ionics be precluded from making this kind of argument or suggestion in the presence of the jury without first having taken the matter up with the court out of the presence of the jury and obtaining the court's permission to do so in the presence of the jury. On the present record I cannot determine that such an argument or suggestion would be material to any question of historical fact or any evaluative question that would properly be submitted to the jury in this case.

In short, because of the potential for unfair use of arguments on matters not submitted to the jury for determination, I expect to require that Ionics make a proffer out of the presence of the jury that persuades me that its contention on this subject is a matter properly stated in the presence of the jury. For this reason, in the Order below USF's motion is ALLOWED to the extent that Ionics is precluded from making any argument or suggestion to the jury on this subject before first making a proffer out of the presence of the jury that persuades the court that no unfair prejudice would result from Ionics' argument or suggestion.

### ORDER

For the foregoing reasons, it is ORDERED:

(1) *Preclusion Order.* Ionics is precluded, at a full trial, or in any phase of a phased trial:

(a) from offering evidence of, or in any way suggesting or commenting upon, measurements performed on resin mixtures different from what is shown in the first Bill of Materials produced to plaintiff's attorneys in this case;

(b) from offering evidence of, or in any way suggesting or commenting upon, alleged use by its expert of monospheres;

(c) from offering evidence of, or in any way suggesting or commenting upon, any alleged use by its expert of "Ionospheres" or "Uniform Beads" in an Electrodeionization Device before the invention of the patent designated as the '741 Patent.

(2) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Offering Or In Any Way Relying Upon Measurements Performed On Resin Mixtures Different From What Is Shown

In the Bills of Materials (Docket No. 289, filed November 22, 2000) (to preclude Ionics' reliance on measurements on mixtures different from those shown on bills of materials ("BOMs") is ALLOWED to the extent that the *Preclusion Order* stated in (1) immediately above indicates).

(3) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Referring To Any Alleged Use By Its Expert of "Ionospheres" Or "Uniform Beads" In An Electrodeionization Device Before the Invention Of the Patent–In–Suit (Docket No. 290, filed November 22, 2000) (to preclude Ionics' references to alleged use by its expert of monospheres) is ALLOWED to the extent that the *Preclusion Order* stated in (1) immediately above indicates.

(4) Plaintiffs United States Filter Corporation, U.S. Filter/Ionpure, Inc., and IP Holding Company's Motion In Limine to Preclude Defendant Ionics, Incorporated From Arguing Or In Any Way Suggesting To the Jury That Ionics Has Used Resin Different From What Is Shown In Its Bills Of Materials (Docket 291, filed November 22, 2000) (to preclude Ionics' saying to jury that Ionics has used resin different from what is shown in BOMs) is ALLOWED to the extent that the *Preclusion Order* stated in (1) immediately above indicates.

(5) Ionics, Incorporated's Motion in Limine to Preclude Any Reference to the Court's Memorandum and Order of October 8, 1999 (Docket No. 293, filed November 22, 2000) (to preclude USF's saying to jury anything about the court's Opinion and Order of October 8, 1999 (Docket No. 227), and USF's opposition (Docket No. 302, filed November 28, 2000) will be considered in a future Memorandum and Order).

(6) Defendant Ionics, Incorporated's Unopposed Motion to File Under Seal (Docket No. 294, filed November 22, 2000) (with sealed matters docketed as 295, 296, 297, 298) and incorporated motions are decided as follows:

(a) The motion to seal (Docket No. 294) is ALLOWED at this time subject to later modifications.

(b) Ionics, Incorporated's motion to exclude testimony of USF's designated expert witness, Terry L. Musika, will be considered in a future Memorandum and Order.

(c) Ionics, Incorporated's motion (Docket No. 304, filed November 28, 2000) to supplement Ionics' witness list by adding persons whose names it wishes to remain under seal will be considered in a future Memorandum and Order.

(7) The next Case Management Conference is set for January 30, 2001, at 3:45 p.m.